# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

| | |
|---|---|
| **STATE OF MISSISSIPPI** | **PLAINTIFF** |
| *ex rel.* **Jim Hood, Attorney General** | |
| | |
| **v.** | **CAUSE NO. 3:11-CV-345-CWR-FKB** |
| | |
| **AU OPTRONICS CORPORATION; AU** | **DEFENDANTS** |

**OPTRONICS CORPORATION
AMERICA, INC.; CHI MEI
CORPORATION; CHI ME
OPTOELECTRONICS
CORPORATION; CHI MEI
OPTOELECTRONICS USA, INC.;
CMO JAPAN CO., LTD; CHUNGHWA
PICTURE TUBES LTD; HANNSTAR
DISPLAY CORPORATION; HITACHI,
LTD; HITACHI ELECTRONIC
DEVICES (USA), INC.; JAPAN
DISPLAY EAST, INC.; LG DISPLAY
CO.; LG DISPLAY AMERICA, INC.;
SAMSUNG ELECTRONICS CO., LTD;
SAMSUNG SEMICONDUCTOR, INC.;
SAMSUNG ELECTRONICS
AMERICA, INC.; SHARP
CORPORATION; SHARP
ELECTRONICS CORPORATION;
TOSHIBA CORPORATION; TOSHIBA
MOBILE DISPLAY CO., LTD;
TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA
AMERICA INFORMATION SYSTEMS,
INC.**

## <u>ORDER</u>

Pending before the Court is the plaintiff's motion to remand.  Docket No. 19.  The defendants have responded in opposition, Docket No. 25, the plaintiff has replied, Docket No. 29, and the Court is ready to rule.  The motion to remand will be granted.  Also pending is the defendants' motion to strike portions of the plaintiff's reply brief.  Docket No. 30.  That motion is fully briefed, *see* Docket Nos. 31 & 33, and will be granted.

I.     *Factual and Procedural History*

On March 25, 2011, the State of Mississippi filed a complaint in the Chancery Court of Hinds County alleging that the defendants had engaged in price-fixing in violation of the Mississippi Consumer Protection Act ("MCPA"), Miss. Code § 75-24-1 *et seq.*, and the Mississippi Antitrust Act ("MAA"), *id.* § 75-21-1 *et seq.*   Docket No. 1-1.

The action was brought by the Attorney General of Mississippi, who sought to protect the State's "quasi-sovereign interest" in its economy and its citizens' economic well-being.   *Id.* at 3. The State claimed that the number of citizens harmed by the defendants' conduct is "a sufficiently substantial segment of the State's population to establish Mississippi's quasi-sovereign interests, as relief is sought on behalf of all local governmental entities and consumers (not limited groups of private parties) who bought a wide range of price-fixed products."   *Id.* at 4.   With this and other language, the Attorney General invoked his authority to file suit as *parens patriae* on behalf of the State and its citizens.   *Id.* at 3-4.

The defendants are companies that manufactured, marketed, sold, and/or distributed LCD panels, which are components of computers, televisions, and a wide variety of other electronic devices.   *Id.* at 4-9.   According to the State, the defendants formed an international cartel that conspired to artificially limit the supply and increase the price of LCD panels between 1996 and 2006, thereby increasing the price of every product containing a LCD panel during that time period. *Id.* at 3-4, 11-12, and 20.   The complaint described how the defendants, who together make up over 80% of the market for LCD panels, carried out their scheme through regular meetings of high-level executives, public statements, and a tangled web of cross-licensing and cross-purchasing agreements and joint ventures.   *Id.* at 11-36.   As a result of these acts, when Mississippi's consumers, local governments, and state agencies purchased products containing LCD panels, they allegedly paid more than they otherwise would have, had the market been fair and competitive.   *Id.* at 19 and 39-49.

It was further alleged that several of the defendants and their co-conspirators had pled guilty to criminal charges brought by the United States Department of Justice for this conduct and paid more than $890 million in criminal fines to the United States government.   *Id.* at 3 and 38-39.   The State claimed that none of those fines were dedicated to recompense Mississippi's consumers and governmental entities, nor were funds set aside for civil penalties owed to States under state laws. *Id.* at 3.

The State sought the following relief: (1) a permanent injunction prohibiting the defendants from continuing to engage in anti-competitive behavior; (2) civil penalties of $10,000 per LCD panel product sold in Mississippi during the relevant time period, pursuant to the MCPA[1]; (3) civil penalties of up to $2,000 per month, per defendant for violations of the MAA during the relevant time period; (4) restitution to the State for its own losses caused by purchasing LCD panel products during the relevant time period; (5) restitution to the State on behalf of its citizens and local governments who suffered losses by purchasing LCD panel products during the relevant time period; (6) punitive damages; and (7) other relief including costs of court, pre- and post-judgment interest, and attorney's fees. *Id.* at 55-56.

On June 9, 2011, the defendants jointly removed the case to this Court. Docket No. 1. They asserted that federal jurisdiction was satisfied under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453. *Id.* at 4. That law establishes federal jurisdiction over certain suits determined to be "class actions" or "mass actions." 28 U.S.C. § 1332(d). The defendants further asserted that a federal question existed pursuant to the Sherman Act, 15 U.S.C. § 7 *et seq.* Docket No. 1-1, at 10.

Shortly thereafter, the United States Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order transferring this case to the United States District Court for the Northern District of California, where Judge Illston presides over a number of other suits against LCD panel manufacturers. Docket No. 19-1; *see In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 07-1827, 2011 WL 560593 (N.D. Cal. Feb. 15, 2011). That Order was postponed to await a decision on the motion to remand. Docket No. 24.

II.      *Standard of Review*

"The party seeking removal bears the burden of showing that federal jurisdiction is proper." *Lone Star OB/GYN Assoc. v. Aetna Health Inc.*, 579 F.3d 525, 528 (5th Cir. 2009) (citation omitted); *see Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921). "[B]ecause the effect of removal is to deprive the state court of an action properly before it, removal raises significant federalism concerns." *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 365-66 (5th Cir. 1995)

---

[1] Civil penalties recovered under the MCPA are divided evenly between the Attorney General's Office of Consumer Protection and the General Fund of the State of Mississippi. Miss. Code § 75-24-19(1)(b).

3

(citations omitted).  "The removal statute is therefore to be strictly construed and any doubt as to the propriety of removal should be resolved in favor of remand."  *In re Hot-Hed Inc.*, 477 F.3d 320, 323 (5th Cir. 2007) (citations omitted).  "The court has wide, but not unfettered, discretion to determine what evidence to use in making its determination of jurisdiction."  *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 570-71 (5th Cir. 2011) (quotation marks and citations omitted) (affirming the district court's decision to decline federal jurisdiction pursuant to a CAFA exception).

III.    *Discussion*

The defendants claimed two independent sources of federal jurisdiction: diversity jurisdiction under CAFA and a federal question presented under the Sherman Act.  Each will be evaluated below.  The Court will begin, though, with a discussion of *parens patriae* actions and a summary of a significant Fifth Circuit case that addressed some of the issues presented here.

A.    *The Nature of These Actions*

"The concept of *parens patriae* stems from the English constitutional system, where the King retained certain duties and powers, referred to as the 'royal prerogative,' which he exercised in his capacity as 'father of the country.'"  *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418, 425 (5th Cir. 2008) (citation omitted); *see Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 600-02 (1982).  While the term originally meant the King's power to protect those without "the legal capacity to act for themselves," *Caldwell*, 536 F.3d at 425, in the United States *parens patriae* actions were "greatly expanded" over the 1900s, *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 257 (1972) (collecting cases).  Today they are "an increasingly popular vehicle for state attorneys general to vindicate the rights of their constituents."  Alexander Lemann, *Sheep in Wolves' Clothing: Removing Parens Patriae Suits Under the Class Action Fairness Act*, 111 Colum. L. Rev. 121, 122 (2011).

*Parens patriae* actions are brought to protect a state's "quasi-sovereign interests," which include interests in "the health and well-being – both physical and *economic* – of its residents in general . . . [and] not being discriminatorily denied its rightful status within the federal system." *Snapp*, 458 U.S. at 607 (emphasis added).  More specifically, quasi-sovereign interests have been held to include suits seeking to abate public nuisances, maintain access to energy sources, and halt

price fixing[2].  *Id.* at 604-06 (collecting cases).

There are boundaries on the *parens patriae* authority.  "A State is not permitted to enter a controversy as a nominal party in order to forward the claims of individual citizens.  But it may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way."  *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981) (citations omitted).[3]  *Parens patriae* actions are disfavored where the injury falls "on a small group of citizens who are likely to challenge" the harm directly.  *Id.* at 739.  But where "a great many citizens . . . are faced with increased costs aggregating millions of dollars per year" and "cannot be expected to litigate [the issue] given that the amounts paid by each consumer are likely to be relatively small," *parens patriae* suits are appropriate.  *Id.*  Unsurprisingly, then, "[p]arens patriae statutes are most common in the antitrust and consumer protection contexts."  Dwight R. Carswell, *CAFA and Parens Patriae Actions*, 78 U. Chi. L. Rev. 345, 348 (2011)

The Supreme Court "has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior."  *Snapp*, 458 U.S. at 607.  In *Snapp*, it reiterated that a state must allege "injury to a sufficiently substantial segment of its population," not just an "injury to an identifiable group of individual residents."  *Id.*  A district court determines the proportion of the population that has allegedly been affected by analyzing the complaint as of the date it was filed.  *See Hollinger*, 654 F.3d at 573 ("Citizenship, for purposes of proving an exception to CAFA, must be analyzed as of the date the complaint or amended complaint was filed.") (citations omitted).

There is a debate, both in our case and in the wider legal community, over whether *parens patriae* suits are class actions brought under a different label or *sui generis*.  *Parens patriae* actions

---

[2]  In *Hawaii v. Standard Oil*, the Supreme Court held that the Clayton Act did not permit the State of Hawaii to seek damages for its citizens via a *parens patriae* suit alleging antitrust violations.  *Hawaii*, 405 U.S. at 260-62.  In response, Congress passed 15 U.S.C. § 15c, which authorizes state attorneys general to sue for antitrust violations and recover damages on behalf of their citizens.  *State v. Marsh & McLennan Companies*, 286 Conn. 454, 466-68 (2008); *see Caldwell*, 536 F.3d at 427 n.5; *TFT-LCD*, 2011 WL 560593, at *4 n.2.  The Supreme Court has acknowledged "the long history of state common-law and statutory remedies against monopolies and unfair business practices" and concluded that "this is an area traditionally regulated by the States."  *California v. ARC America Corp.*, 490 U.S. 93, 101 (1989).

[3]  While *Maryland* was brought in the Supreme Court as an original action, it remains a helpful explanation of the *parens patriae* authority.

are certainly a form of representative action, and "attorneys general often hire plaintiffs' lawyers to help prosecute parens patriae suits. . . . [T]he conceptual similarity between [class actions and parens patriae actions] is unavoidable." Lemann, 111 Colum. L. Rev. at 133 (citations omitted).

That said, distinctions can be identified. For one, an attorney general is not a true class representative. "Rather, in representing the citizens, the State [through its Attorney General] acts more in the capacity of trustee representing beneficiaries or a lawyer representing clients, neither of which is the type of representation essential to the representational aspect of a class action." *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 176-77 (4th Cir. 2011); *see LG Display Co. v. Madigan*, 665 F.3d 768, 772 (7th Cir. 2011) ("This case was brought by the Attorney General, not by a representative of a class."). The Fourth Circuit has concluded that "[a]ll class actions are representative in nature; but not all representative actions are necessarily class actions." *McGraw*, 646 F.3d at 175 n.1.

There also are procedural differences between the two. *See id.* at 175-76; *Madigan*, 665 F.3d at 772. "Unlike private litigants, the Attorneys General have statutory authority to sue in *parens patriae* and need not demonstrate standing through a representative injury nor obtain certification of a class in order to recover on behalf of individuals." *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) (citations omitted). "Additionally, attorneys general are not always required to provide notice to the citizens whose damages they are recovering, and the citizens may not be able to opt out." Carswell, 78 U. Chi. L. Rev. at 362. Further, in some states a *parens patriae* suit may result in a recovery for the state's General Fund but not the individual victims of the fraud. *Washington*, 659 F.3d at 848.

The Fifth Circuit has found that a *parens patriae* suit may, in certain circumstances, constitute a CAFA mass action. *Caldwell*, 536 F.3d at 430. It has recited CAFA's legislative history to conclude that "the term 'class action' should be defined broadly to prevent 'jurisdictional gamesmanship.'" *Id.* at 424. But it has not held that *parens patriae* suits are necessarily class or mass actions. *Id.* at 430.

      *B.     The Fifth Circuit's Decision in* Caldwell

Because *Caldwell* controls our case and its interpretation is contested by the parties, it will be summarized here.

In *Caldwell*, the Attorney General of Louisiana filed suit against a number of insurance

6

companies and their business partners, claiming that they had "continuously manipulated Louisiana commerce by rigging the value of policyholder claims and raising the premiums." *Id.* at 422 (quotation marks omitted).  The complaint alleged that the defendants had systematically undervalued and underpaid policyholders' property claims in the aftermath of Hurricanes Katrina and Rita. *Id.* at 422-23.  The suit, which was styled as a *parens patriae* action and filed in Louisiana state court, sought forfeiture of illegal profits, treble damages, and injunctive relief. *Id.* at 423.

The defendants removed the case to the United States District Court for the Eastern District of Louisiana, arguing federal jurisdiction under CAFA. *Id.*  The district court determined that the real parties in interest were the individual policyholders who had been harmed, and reasoned that the suit was "really an artfully pled class action." Transcript of Hearing at 32, *State of Louisiana v. Allstate Ins. Co.*, No. 07-9409 (E.D. La. Apr. 2, 2008) ("Caldwell Transcript").  The district court rejected the argument that the suit was a CAFA mass action. *Id.* at 21.

The Fifth Circuit affirmed on different grounds.  It analyzed the complaint claim-by-claim, finding that Louisiana was a real party in interest as to the injunctive relief and that the policyholders were real parties in interest with respect to the treble damages. *Caldwell*, 536 F.3d at 429-30.  As real parties in interest, the policyholders' citizenship had to be counted, and since they were Louisiana residents, there was minimal diversity of the parties as required by CAFA. *Id.* at 430. The Fifth Circuit declined to address whether the suit was a class action – the district court's rationale for federal jurisdiction – and found that it was a mass action: "a civil action involving the monetary claims of 100 or more persons that is proposed to be tried jointly." *Id.*

Judge Southwick, in dissent, concluded that the suit was neither a class action nor a mass action as CAFA defines those terms. *Id.* at 433 (Southwick, J., dissenting).  The Attorney General's complaint did not invoke the federal or state class action rules, and the mass action provision could not be invoked by a defendant seeking to join additional parties. *Id.* at 434-35.  Instead, Judge Southwick argued that Louisiana's courts had jurisdiction over the complaint as it was pled and should first resolve whether the Attorney General could recover treble damages on behalf of Louisiana consumers in a representative capacity. *Id.*  Under the applicable standard of review, which requires doubts and uncertainties to be resolved against a finding of federal jurisdiction, he

thought the case should have been remanded.  *Id.* at 433.[4]

C.      *The Present Dispute*

1.      The Class Action Fairness Act

"Congress enacted CAFA to encourage federal jurisdiction over interstate class action lawsuits of national interest."  *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 797 (5th Cir. 2007).  "The CAFA exceptions are 'designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state.'"  *Id.* at 803 (quoting *Hart v. FedEx Ground Package Sys., Inc.*, 457 F.3d 675, 682 (7th Cir. 2006)); *see McGraw*, 646 F.3d at 178 ("CAFA is also sensitive to deeply-rooted principles of federalism, reserving to the States primarily local matters.").

To establish jurisdiction under CAFA, the removing party must first show that the parties are minimally diverse, which means that:

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;
(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

28 U.S.C. § 1332(d)(2)(A)-(C).  The removing party must then prove that the action is a class action or a mass action.

A CAFA class action is "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  *Id.* § 1332(d)(1)(B).  A class action must have 100 or more "members of all proposed plaintiff classes" and an aggregate amount in controversy in excess of $5 million.  *Id.* § 1332(d)(2), (d)(5)(B), and (d)(6).

---

[4] *Caldwell* was "groundbreaking," Lemann, 111 Colum. L. Rev. at 133, and has been discussed in a number of circuit and district court decisions, discussed below.  It also has been the subject of academic attention, perhaps because of an emerging circuit split. *E.g.*, *id.*; Jacob Durling, *Waltzing Through a Loophole: How Parens Patriae Suits Allow Circumvention of the Class Action Fairness Act*, 83 U. Colo. L. Rev. 549 (2012); Carswell, 78 U. Chi. L. Rev. at 353-57; Guyon Knight, *The CAFA Mass Action Numerosity Requirement: Three Problems with Counting to 100*, 78 Fordham L. Rev. 1875 (2010).

CAFA defines a mass action as:

> any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

*Id.* § 1332(d)(11)(B)(i).  The jurisdictional amount requirement in 28 U.S.C. § 1332(a) is $75,000.  *Id.* § 1332(a).  Therefore, in a mass action, federal courts have jurisdiction "only" over plaintiffs whose individual claims exceed $75,000, exclusive of interest and costs.  *Id.* § 1332(d)(a) and (d)(11)(B)(i).  Mass actions may not be transferred to a multidistrict litigation court "unless a majority of the plaintiffs in the action request transfer."  *Id.* § 1332(d)(11)(C)(I).

Once the removing party meets its burden to establish federal jurisdiction, the party seeking remand can attempt to prove one of CAFA's exceptions to jurisdiction.  *Hollinger*, 654 F.3d at 571.  One of those exceptions states that "the term 'mass action' shall not include any civil action in which . . . all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action."  28 U.S.C. § 1332(d)(11)(B)(ii) and (d)(11)(B)(ii)(III).

### 2.    Arguments

The State argues that when the complaint is viewed as a whole, the real party in interest is the State of Mississippi, not its citizens and local governments.  Docket No. 20, at 5-7.  Because the State is not a 'citizen' for purposes of diversity jurisdiction, it concludes that there is no minimal diversity.  *Id.* at 5.  The State next claims that the action is not a CAFA class action because it was not filed pursuant to Federal Rule of Civil Procedure 23 or an analogous state rule; in fact, Mississippi lacks a class action rule.  *Id.* at 9-10.  Finally, the State argues that its suit is not a mass action pursuant to an exception in CAFA denying mass action status to suits brought on behalf of the general public.  *Id.* at 10-11.

The defendants agree that the State is the real party in interest as to the damages it seeks on its own behalf, civil penalties, and injunctive relief.  Docket No. 25, at 6.  They argue, though, that because the complaint also seeks damages for injuries incurred by Mississippi's consumers and local governments, those consumers and local governments are also real parties in interest.  *Id.* at 6-9.  Because Mississippi's consumers and local governments are obviously citizens of Mississippi, and

none of the defendants are citizens of Mississippi, the defendants conclude that minimal diversity is established. *Id.* The defendants next challenge the State's interpretation of "class action," claiming that this suit is one within the meaning of CAFA. *Id.* at 9-12. Finally, they argue that the suit is a mass action that does not fall into the State's claimed statutory exception, again because "individual Mississippi consumers are the real parties in interest when the State seeks to recover damages on their behalf in a representative capacity." *Id.* at 12.

In its reply, the State explains in more detail its contention that *parens patriae* actions are procedural vehicles separate and distinct from class actions. Docket No. 29, at 5-9. It again claims that mass action status should be denied because the case is brought on behalf of the general public, arguing that the products at issue "are ubiquitous in modern life and inflated prices for these products would affect nearly every single Mississippi resident." *Id.* at 12 n.6.

3.    The Defendants' Motion to Strike

The State's reply brief then argues that the defendants failed to prove CAFA's amount in controversy requirements. *Id.* at 13-17. It denies that the defendants have put forward any evidence that the aggregate amount sought in the complaint exceeds $5 million and that at least one consumer or local government seeks more than $75,000. *Id.* The State claims that the defendants were required to provide such proof in their Notice of Removal. *Id.* at 14-16. Finally, it recites that if this case is a mass action, the Court should bifurcate the suit. *Id.* at 19.

The defendants have moved to strike these arguments, claiming that these grounds were not briefed in the State's original motion to remand. Docket No. 30, at 2-3. In the alternative, the defendants ask for leave to file a sur-reply and attach affidavits to establish the amount in controversy requirements. *Id.* They have included a summary of their argument to be made in any sur-reply. *Id.* at 3-8. The State opposes the motion, Docket No. 31, and the defendants have responded, Docket No. 33. The defendants' response brief contains the affidavits they would have attached to any sur-reply. *See* Docket Nos. 33-1; 33-2; 33-3.

The defendants' motion is well-taken and will be granted. The State should have presented all of its arguments for remand in its original motion. *Kennedy v. BAE Sys. Info. Tech., Inc.*, No.1:09-cv-254, 2011 WL 6211171, at *7 (S.D. Miss. Dec. 14, 2011) ("A reply memorandum is not the appropriate place to raise new arguments"). The State's new arguments will be stricken and the defendants are excused from proving CAFA's amount in controversy requirements. Further, for

10

reasons that will become apparent later, the State's suggestion of bifurcation is moot.

        4.      Analysis

        a.      Minimal Diversity

The State of Mississippi is not a 'citizen' for purposes of diversity jurisdiction. *In re Katrina Canal Litig. Breaches*, 524 F.3d 700, 706 (5th Cir. 2008) ("*Road Home*").  In this situation, "a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."  *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980) (citations omitted).  The question is whether Mississippi's citizens and local governments are real parties in interest and must be counted for citizenship purposes.

"[T]he 'real party in interest' is the party who, by substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *Richards v. Reed*, 611 F.2d 545, 546 n.2 (5th Cir. 1980) (quotation marks and citation omitted). Federal Rule of Civil Procedure 17 states that actions "must be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a)(1).  It also states, however, that executors, administrators, guardians, and parties "authorized by statute" "may sue in their own names without joining the person for whose benefit the action is brought."  *Id.*; *see Proctor v. Gissendaner*, 579 F.2d 876, 880 (5th Cir. 1978).

In *Caldwell*, the property insurance policyholders who had been injured by the defendants' conduct were considered real parties in interest as to the claim for treble damages, because Louisiana law granted the policyholders the right to bring suit on their own for those damages.

> We conclude that as far as the State's request for treble damages is concerned, the policyholders are the real parties in interest.  The text of § 137 of the Monopolies Act, which authorizes the recovery of treble damages, plainly states that "any person who is injured in his business or property" under the Monopolies Act "shall recover[] treble damages."  The plain language of that provision makes clear that individuals have the right to enforce this provision.  Accordingly, we agree with the district court and hold that under § 137 the policyholders, and not the State, are the real parties in interest.

*Caldwell*, 536 F.3d at 429 (brackets omitted); *see West Virginia ex rel. McGraw v. Comcast Corp.*, 705 F. Supp. 2d 441, 450 (E.D. Pa. 2010) (finding that "a discrete group of Comcast's premium subscribers" were real parties in interest as to an attorney general's claim for treble damages on their behalf).

11

Here, the MCPA permits individuals to sue for damages incurred as a result of prohibited business practices.  Miss. Code § 75-24-15(1).  Before filing such an action, the consumer "must have first made a reasonable attempt to resolve any claim through an informal dispute settlement program approved by the Attorney General."  *Id.* § 75-24-15(2).  The MAA also permits individuals to sue when "injured or damages by a trust and combine . . . or by its effects direct or indirect."  *Id.* § 75-21-9.  Under *Caldwell*, Mississippi's consumers are considered real parties in interest with respect to the State's request for restitution on their behalf.  *Caldwell*, 536 F.3d at 429; *accord Hood v. F. Hoffman-La Roche, Ltd.*, 639 F. Supp. 2d 25, 31-33 (D.D.C. 2009).

These statutes afford local governments similar rights.  The MCPA provides a remedy to "any person who purchases or leases goods or services primarily for personal, family or household purposes" who is injured by a prohibited business practice.  Miss. Code § 75-24-15(1).  A local government is considered a person under the law, *id.* § 75-24-3(a), and at least one state court has found that a governmental entity purchases goods for its own, "personal" uses, *id.* § 75-24-15(1).  *Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *12 (Miss. Ch. Jan. 17, 2006).  Further, local governments have the right to sue under the MAA for "all damages of every kind sustained . . . and in addition a penalty of five hundred dollars ($500.00)."  Miss. Code § 75-21-9.

As a result, the State of Mississippi, its consumers, and its local governments are all real parties in interest in this action.  While the State has no citizenship for purposes of diversity jurisdiction, Mississippi's consumers and local governments are obviously citizens of Mississippi.  Counting their citizenship, and seeing that no defendant is a citizen of Mississippi, CAFA's requirement of minimal diversity has been met.  *See* 28 U.S.C. § 1332(d)(2)(A).

> b.      Class Action

This suit is not a CAFA class action because it was not brought pursuant to Federal Rule of Civil Procedure 23 or a "similar State statute or rule of judicial procedure."  *Id.* § 1332(d)(1)(B).  The action was not originally filed in federal court under Rule 23 and the parties agree that Mississippi has no rule permitting class actions.[5]  None of the state laws under which this action was

---

[5]  To be clear, class actions are not authorized in Mississippi courts.  *USF&G Ins. Co. of Miss. v. Walls*, 911 So. 2d 463, 467 (Miss. 2005) ("Since there is no rule or statute which expressly or impliedly provides for class actions, we are compelled to conclude that they are not permitted in any legal proceedings in our state courts.").

The MCPA also bars class actions attempted to be brought under its auspices.  Miss. Code § 75-24-15(4).  "Thus, any purported class action complaint or master complaint on behalf of several plaintiffs asserting violations

brought impose class action-like requirements of adequacy, numerosity, commonality, or typicality, nor is the Attorney General, with his distinct duties, powers, and interests, a typical class representative. *See Madigan*, 665 F.3d at 772; *McGraw*, 646 F.3d at 174-77; *In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, 2012 WL 10552, at *7-8 (E.D. La. Jan. 3, 2012).

In a recent decision addressing issues much like our own, Judge Fallon of the Eastern District of Louisiana found that "Congress chose to define 'class action' not in terms of joinder of individual claims or by representative relief in general, but in terms of the statute or rule the case is filed under." *Vioxx*, 2012 WL 10522, at *8 (citing 28 U.S.C. § 1332(d)(1)(B)). Because the Attorney General of Kentucky's *parens patriae* suit was not brought under such a federal or state statute or rule, it was remanded to Kentucky state court.[6] *Id.* Judge Fallon reasoned, "[i]f this is a formalistic outcome, it is a formalism dictated by Congress. Moreover, it is an understandable bright-line rule." *Id.* The Fifth Circuit declined to review the decision. Order, In re Vioxx Prod. Liab. Litig., No. 12-90002 (5th Cir. Feb. 24, 2012).

The defendants in our case interpret CAFA more broadly. They rely upon CAFA's legislative history to argue that "generally speaking, lawsuits that *resemble* a purported class action should be considered class actions for the purpose of applying CAFA." Docket No. 25, at 11 (brackets omitted) (quoting S. Rep. No. 109-14, at 35). But the word "resemble" is not found in 28 U.S.C. § 1332(d). That omission leads to an ongoing debate about whether the Senate Report relied upon by the defendants is a reliable source to discern Congress's intent in enacting CAFA.

The Fourth Circuit has found that the Senate Report in question "was issued 10 days *after* CAFA was signed into law, and for that reason alone, it is a questionable source of congressional intent. . . . *Post hoc* statements of a congressional Committee are not entitled to much weight." *McGraw*, 646 F.3d at 177 (citations, quotation marks, and brackets omitted); *see Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir. 2006) (same). The Second and Third Circuits declined to rely upon this Senate Report to establish CAFA's burden-shifting framework, where CAFA's text did not address burden-shifting. *Galeno*, 472 F.3d at 57-58; *Morgan v. Gay*, 471 F.3d 469, 472-73 (3d

---

of Section 75-24-5 is arguably improper." Walker W. Jones, III & Jason R. Bush, *An Overview of the Mississippi Consumer Protection Act*, Mississippi Defense Lawyers Assoc. Quarterly, Winter 2006, at 12 (collecting cases).

[6] The defendant in *Vioxx* did not argue that the suit was a mass action. *Vioxx*, 2012 WL 10522, at *5 n.4.

Cir. 2006).  The Seventh Circuit also found this Senate Report problematic, reasoning that "when the legislative history stands by itself, as a naked expression of 'intent' unconnected to any enacted text, it has no more force than an opinion poll of legislators – less, really, as it speaks for fewer." *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005); *see also Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 685-86 (9th Cir. 2006).

The Eleventh Circuit thought the Senate Report of greater value, observing that although it "was issued ten days following CAFA's enactment, it was submitted to the Senate on February 3, 2006 – while that body was considering the bill."  *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1206 n.50 (11th Cir. 2007) (citation omitted).  But that court used legislative history to interpret the "statutory labyrinth" of CAFA's mass action provisions, not the relatively more straightforward class action provisions.  *Id.* at 1199.  The Fifth Circuit has quoted the Senate Report and the language relied upon by the defendants, but also did not address whether the suit before it was a class action.  *Caldwell*, 536 F.3d at 424 and 430.  Others have found "no clear answer" on the Senate Report's validity for a legislative history analysis.  Guyon Knight, *The CAFA Mass Action Numerosity Requirement: Three Problems with Counting to 100*, 78 Fordham L. Rev. 1875, 1892 (2010).

"[A] powerful line of Supreme Court authority suggests that legislative history should rarely be used in statutory interpretation, because only the text of the law has been passed by Congress, not the often-contrived history."  *Stanley ex rel. Estate of Hale v. Trinchard*, 579 F.3d 515, 518 n.6 (5th Cir. 2009) (quotation marks and citations omitted).  "[T]here is no reason to recite legislative history" when the statutory text is clear, in part because "as is often the case with legislative history, statements can be pulled from the record to support the contrary proposition as well."  *Khalid v. Holder*, 655 F.3d 363, 371 (5th Cir. 2011) (citation omitted); *see Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 377 (5th Cir. 2009) (collecting cases).[7]

Because CAFA unambiguously defines class action, it is unnecessary to consider the legislative history on this point.  This Court will apply the "understandable bright-line rule" articulated in *Vioxx*.  2012 WL 10552, at *8.

---

[7] An opinion from the United States District Court for the District of New Jersey aptly illustrates one way in which CAFA's legislative history can be manipulated to support either party's position.  *See Harvey v. Blockbuster, Inc.*, 384 F. Supp. 2d 749, 752-54 (D.N.J. 2005).

The conclusion that this suit is not a class action accords with rulings by the Fourth, Seventh, and Ninth Circuits. *Id.* at *6-8 (citing *Madigan*, 665 F.3d at 770-72*; Washington*, 659 F.3d at 846-48[8]; and *McGraw*, 646 F.3d at 174-77); *see also Kentucky ex rel. Conway v. Daymar Learning, Inc.*, No. 4:11-cv-103, 2012 WL 1014989, *6 (W.D. Ky. Mar. 22, 2012). Nor is it in conflict with the Fifth Circuit's decision in *Caldwell*, which again did not resolve whether Louisiana's suit was a CAFA class action. *Vioxx*, 2012 WL 10552, at *5-6 and 8 (quoting *Caldwell*, 536 F.3d at 429-30).

### c. Mass Action

Under *Caldwell*, this suit is a mass action. It is a civil action "in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact." 28 U.S.C. § 1332(d)(11)(B)(i). *Caldwell* stands for the proposition that the words "persons" and "plaintiffs" in this sub-section are to be defined as "real parties in interest." Here, as there, this suit is a mass action because there are more than 100 real parties in interest that seek a joint trial on common questions of law or fact.[9]

---

[8] *Madigan* and *Washington* involved the same issues pending before this Court: whether the attorney generals of Illinois, Washington, and California could, via *parens patriae* suit alleging antitrust violations by LCD panel makers, seek restitution, damages for their citizens, injunctive relief, and civil penalties in their own state courts. *Madigan*, 665 F.3d at 770; *Washington*, 659 F.3d at 846.
     The Attorney General of South Carolina brought a similar suit in state court. The defendants removed the action to federal court for reasons akin to those argued here. The action was remanded. *South Carolina v. AU Optronics Corp.*, No. 3:11-cv-731, 2011 WL 4344079 (D.S.C. Sept. 14, 2011).

[9] Although *Caldwell* forecloses it, there is a possibility that a "mass action" should be thought of as a "mass joinder." Courts apply CAFA's mass action provisions to mass joinders, and typically decline to apply the mass action provisions to suits lacking 100 named plaintiffs. *See Lowery*, 483 F.3d at 1198 ("CAFA's mass action provisions extend federal diversity jurisdiction to certain actions brought individually by large groups of plaintiffs.") (evaluating an amended complaint listing over 400 plaintiffs under CAFA's mass action provisions); *Abrego Abrego*, 443 F.3d at 678 (evaluating a complaint filed by 1,160 plaintiffs as a mass action); *Nevada v. Bank of America Corp.,* 672 F.3d 661, 672 (9th Cir. 2012) (holding that the State of Nevada's *parens patriae* suit was not removable as a mass action because the state was the real party in interest and thus "the action [fell] 99 persons short of a 'mass action'"); *Anderson v. Bayer Corp.*, 610 F.3d 390, 393 (7th Cir. 2010) ("The instant cases contain fewer than 100 plaintiffs and thus are not removable under the plain language of the statute."); *Nunn v. Monsanto Co.*, No. 4:11-cv-1657, slip op. at 5 (E.D. Mo. Nov. 7, 2011) ("In order for this Court to have jurisdiction under the mass action provisions, defendants must demonstrate that there really are 100 plaintiffs."); *TFT-LCD*, 2011 WL 560593, at *8 ("courts have held that the plaintiffs in a mass action must be individually named plaintiffs with their own direct claims in order to be counted toward CAFA's 100 person requirements.") (collecting cases); *see also* Nan S. Ellis, *The Class Action Fairness Act of 2005: The Story Behind the Statute*, 35 J. Legis. 76, 104-05 (2009); Hittner et al., Fed. Civ. Pro. Before Trial – 5th Cir. Ed. ¶ 2:3027 (2011) (mass actions require 100 or more plaintiffs and CAFA can be avoided "by filing separate lawsuits, each involving fewer than 100 plaintiffs").
     Mississippi's own history sheds some light on the issue. Because Mississippi law prohibits class actions, mass joinders became a popular work-around. *See, e.g.*, *Harold's Auto Parts, Inc. v. Mangialardi*, 889 So. 2d 493, 494 (Miss. 2004) ("The case before us has endured seven amended complaints, and now involves the claims of 264

The State argues that a statutory exception requires remand.[10]   CAFA denies federal jurisdiction to any mass action in which "all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action."  *Id.* § (d)(11)(B)(ii)(III).  This will be referred to as the "general public exception."

Other courts have found the general public exception to exclude *parens patriae* suits from federal jurisdiction.  *See Madigan*, 665 F.3d at 772 ("By the plain language of that provision, too, this case is not a mass action."); *Connecticut v. Moody's Corp.*, No. 3:10-cv-546, 2011 WL 63905, at *4 (D. Conn. Jan. 5, 2011) ("Because the State is a real party in interest and sues to protect and vindicate the rights of its public in general under Conn. Gen. Stat. § 42–110m, this action is not a 'mass action.'"); *see also South Carolina v. AU Optronics Corp.*, No. 3:11-cv-731, 2011 WL 4344079, at *7 (D.S.C. Sept. 14, 2011) (same).[11]  Several commentators also believe this exception applies to *parens patriae* suits.  *See* Marcy Hogan Greer & Paul L. Peyronnin, *The Class Action Fairness Act of 2005*, *in* A Practitioner's Guide to Class Actions 241, 282 (Marcy Hogan Greer, ed. 2010) ("a mass action does not include state attorney general actions"); Peter M. Cummins, *Parens Patriae Suits Filed by State AGs*, For the Defense, Feb. 2008 ("CAFA similarly offers no hope to defendants in this situation because enforcement actions filed by State AGs are specifically excluded from the statute's coverage."); Catherine M. Sharkey, *CAFA Settlement Notice Provision: Optimal*

---

plaintiffs against 137 named defendants who have identified approximately 600 different employers where asbestos exposure might have taken place.").  Mass joinders were arguably so popular that CAFA's drafters made them removable; at least, some lawyers have concluded as much:  "The inclusion of 'mass actions' in [CAFA's] definition of 'class action' was a Congressional attempt to address notorious joinder abuses at the state level in Mississippi and other states."  Anthony Rollo & Gabriel A. Crowson, *Mapping the New Class Action Frontier – A Primer on the Class Action Fairness Act and Amended Federal Rule 23*, 59 Consumer Fin. L. Q. Rep. 11, 14 (Spring-Summer 2005); *see also* S. Amy Spencer, *Once More Into the Breach, Dear Friends: The Case for Congressional Revision of the Mass Action Provisions in the Class Action Fairness Act of 2005*, 39 Loy. L.A. L. Rev. 1067, 1081 (2006) (discussing the mass action provision's attempt to address "cases with claims joined under liberal West Virginia or Mississippi statutes"); 14B Charles A. Wright et al., Fed. Practice & Procedure § 3724, at 910-11 (4th ed. 2009) ("The mass actions made removable [by CAFA] typically are actions brought in states whose court systems do not provide for class actions."); Knight, 78 Fordham L. Rev. at 1878.

    [10]   "Indeed, [CAFA] is not complete without its exceptions."  *Hollinger*, 654 F.3d at 569.

    [11]   At least one court has found the exception applicable outside of the *parens patriae* context, in a case where the sole plaintiff was a citizen suing on behalf of the general public.  *Breakman v. AOL LLC*, 545 F. Supp. 2d 96, 100-01 (D.D.C. 2008).  The defendant conceded that the general public exception applied.  *Id.* at 101.

*Regulatory Policy?*, 156 U. Pa. L. Rev. 1971, 1979 n.33 (2008) ("CAFA permits defendants to remove 'mass actions' (or class-action-like lawsuits) from state to federal court, but it contains an exception for parens patriae actions."); Antitrust Modernization Commission, Report and Recommendations 272 (2007) ("CAFA also does not apply to *parens patriae* actions by state attorneys general."); Gregory P. Joseph, *Federal Class Action Jurisdiction After CAFA, Exxon Mobil and Grable*, 8 Del. L. Rev. 157, 181 (2006).

Whether the general public exception can be invoked in the Fifth Circuit is contested. *Caldwell* determined that the State of Louisiana's suit was a mass action without addressing whether the exception applied. One possible reason for this is that the Attorney General of Louisiana failed to argue the exception to the Fifth Circuit. *See* Brief of Appellant, State of Louisiana ex rel. Caldwell v. Allstate Ins. Co., No. 08-30465 (5th Cir. May 19, 2008); *see also South Carolina*, 2011 WL 4344079, at *4 (noting that the Attorney General of Louisiana waived another argument on appeal as well). The failure to brief the issue resulted in the State forfeiting any claim it had to the exception. *See United States v. Delgado*, 672 F.3d 320, 329 n.6 (5th Cir. 2012). Nor did the district court need to consider the general public exception, as it considered the suit a class action only. *See* Caldwell Transcript at 21.

With no such procedural default here, this Court will proceed to consider whether this action satisfies CAFA's general public exception.

i.    "Claims . . . Asserted on Behalf of the General Public"

The exception first states that all of the claims in the suit must be asserted on behalf of the general public, not individuals or a purported class. 28 U.S.C. § 1332(d)(11)(B)(ii)(III). The facts of *Caldwell* would not have satisfied this requirement. The State of Louisiana's claim for treble damages was brought on behalf of a limited subset of its population: those policyholders who had paid premiums to certain defendants for particular kinds of insurance policies. *See Ohio v. GMAC Mortg., LLC*, 760 F. Supp. 2d 741, 748 (N.D. Ohio 2011) (denying motion to remand *parens patriae* suit where relief sought "would benefit only a specific subset of Ohio citizens . . . and would do little to protect Ohio citizens generally").

In contrast, the complaint in our case alleges that the defendants, who control over 80% of the market for LCD panels, have substantially affected a product contained in laptops, desktop computer monitors, mobile phones, digital cameras, video cameras, televisions, motor vehicles, and

17

other electronic devices commonly used and purchased in everyday life.  Docket No. 1-1, at 4 and 17.[12]  United States census data shows that during the relevant time period, computers and mobile phones were present in more than half of America's households.  Docket No. 1-1, at 4 n.1.[13]  The alleged price-fixing was so broad and pervasive as to affect the general public, and the State's claims in this suit are asserted on behalf of the general public.  *See TFT-LCD*, 2011 WL 560593, at *5 ("In contrast to *Comcast* and *Caldwell*, where the States sued on behalf of limited groups of private parties (premium cable subscribers and insurance policyholders), here the States are suing on behalf of all consumers in their respective states who purchased a wide range of allegedly price-fixed products.").

There also are significant differences between the insurance market at issue in *Caldwell* and the electronics market here that broaden the latter's reach into the general population.  The insurance industry has a paper trail documenting each agreement between insured and insurer, and more importantly, each insured is readily identifiable.  But electronics retailers permit customers to pay with cash and do not record personally identifiable information on every transaction.  It is unlikely that the defendants have records identifying every Mississippian who purchased a product containing a LCD panel between 1996 and 2006.  There also is a person-to-person resale market of electronic goods that does not exist in the insurance industry, which further expands the percentage of the population affected by the violations alleged in this suit.  Moreover, the sheer number of LCD panel products purchased and used by consumers – including computers, mobile phones, toys, car navigation systems, and televisions, among others – indisputably fall within the state's quasi-sovereign interest.  If this collection of items did not implicate the overall economic well-being of Mississippi's citizens, then the Court would be hard pressed to find something which does.

        ii.     Pursuant to a "Statute Specifically Authorizing Such Action"

The second and final element of the general public exception is satisfied, as the claims in this action are brought under state statutes specifically authorizing these kinds of suits.

---

[12]  The State further alleged that LCD panels are not minor components of those devices, claiming that LCD technology has a "virtually 100% market share for laptops and flat panel computer monitors, and at least 80% market share for flat panel TVs."  Docket No. 1-1, at 14.

[13]  Courts may take judicial notice of census data.  *Hollinger*, 654 F.3d at 571-72 ("United States census data is an appropriate and frequent subject of judicial notice.") (citations omitted).

The Attorney General of Mississippi is generally empowered by a state law granting him "the powers of the Attorney General at common law."  Miss. Code § 7-5-1; *see Hood ex rel. Mississippi v. Microsoft Corp.*, 428 F. Supp. 2d 537, 544-45 (S.D. Miss. 2006).  Under Mississippi common law, the Attorney General has the "power and authority . . . to institute, conduct and maintain all suits necessary for the enforcement of the laws of the State, preservation of order and the protection of public rights."  *Hood v. AstraZeneca Pharm., LP*, 744 F. Supp. 2d 590, 595 (N.D. Miss. 2010) (citations omitted).  *Parens patriae* suits to protect the State's quasi-sovereign interest in its citizens' economic well-being are a part of that common law tradition.  *See* Part III.A, *infra*.  A number of state and federal courts have recognized the Attorney General's *parens patriae* authority to represent Mississippi's consumers.  *See BASF*, 2006 WL 308378, at *3 (collecting cases); *Microsoft*, 428 F. Supp. 2d at 544-46.

More specifically, the MCPA and the MAA provide statutory grounds for the relief sought in this suit.  Under the MCPA,

> [w]henever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice prohibited by Section 75-24-5, and that proceedings would be in the public interest, he may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of such method, act or practice.

Miss. Code § 75-24-9.  The next section confirms that in those suits, "[t]he court may make such additional orders or judgments, including restitution, as may be necessary to restore to any person in interest any monies or property, real or personal, which may have been acquired by means of any practice prohibited by this chapter."  *Id.* § 75-24-11.  Civil penalties, investigative costs, and reasonable attorney's fees are authorized by a later section.  *Id.* § 75-24-19(1)(b).

The MAA not only authorizes persons to recover damages for anti-competitive behaviors, *id.* § 75-21-9, but permits the Attorney General and the Attorney General alone to recover civil penalties for those behaviors, *id.* § 75-21-7.  "This statute clearly gives the Attorney General of the State the authority to bring suit in the name of the State for violations of Mississippi antitrust law."  *Moore ex rel. State of Miss. v. Abbott Laboratories, Inc.*, 900 F. Supp. 26, 31 (S.D. Miss. 1995).  Further, a Mississippi state court has found punitive damages to be available for violations of the MAA.  *BASF*, 2006 WL 308378, at *11.

Taken together, these statutes authorize the Attorney General to receive all of the relief

sought in the complaint.  Because "all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class)," and are brought "pursuant to a State statute specifically authorizing such action," this suit satisfies the general public exception.  28 U.S.C. § 1332(d)(11)(B)(ii)(III).

Having determined that this case is neither a class action nor a mass action that does not fall into a statutory exception, the case will be remanded to state court.

D.      The Future of This Case

An exception to the usual law of remand permits the defendants to seek an immediate appeal.  *See Road Home*, 524 F.3d at 702 n.1 (quoting 28 U.S.C. § 1453(c)(1)).  Should the Fifth Circuit reverse and remand this case here as a CAFA mass action, the Court will now describe its understanding of what the law requires upon its return.  All involved have an interest in there being only one appeal.

If returned here as a mass action, the case will be severed in accordance with the command of 28 U.S.C. § 1332(d)(11)(B)(i).  The State's interests in permanent injunctive relief; civil penalties; restitution for losses incurred by the State in its proprietary capacity; and restitution for losses incurred by individuals[14] claiming less than or equal to $75,000 each, including individual punitive damages but excluding interest and costs; will all be remanded to state court.  In mass actions, federal jurisdiction extends "only" to individual claims that exceed $75,000.  28 U.S.C. § 1332(d)(11)(B)(i).  This Court's supplemental jurisdiction cannot be extended to those individuals with claims under $75,000.  *See Lowery*, 483 F.3d at 1206 n.51.

The defendants argue that the State's request for punitive damages suffices to permit every individual claim to remain in federal court, because the aggregate amount of punitive damages exceeds $75,000 and is imputed to each individual.  Docket No. 1, at 8 (citing *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335-36 (5th Cir. 1995)).  But *Allen* was determined to conflict with a previous panel decision and therefore is no longer good law as to that point.  "Because *Lindsey* is the earliest, and thus controlling, decision in this circuit, the punitive damages claims of the putative class cannot be aggregated and attributed to each plaintiff to meet the jurisdictional requirement." *H&D Tire and Automotive-Hardware, Inc. v. Pitney Bowes Inc.*, 227 F.3d 326, 330 (5th Cir. 2000)

---

[14]  In this discussion, "individuals" and "individual claims" includes consumers and local governments.

(discussing *Lindsey v. Alabama Tel. Co.*, 576 F.2d 593 (5th Cir. 1978)).   Other circuits have recognized that *Pitney Bowes* effectively overruled this part of *Allen*.   *E.g.*, *Martin v. Franklin Capital Corp.*, 393 F.3d 1143, 1148 (10th Cir. 2004); *Smith v. GTE Corp.*, 236 F.3d 1292, 1301 (11th Cir. 2001).

It is not clear how much in restitution the State is seeking on behalf of individuals. Assuming without deciding that this case merits punitive damages under Mississippi law, the parties are bound by constitutional limits on punitive damages.   *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process"); *see also Church v. Nationwide Ins. Co.*, No. 3:10-cv-636, 2011 WL 2112416, at *4 n.2 (S.D. Miss. May 26, 2011) (citing *Munro v. Golden Rule Ins. Co.*, 393 F.3d 720, 721 (7th Cir. 2004) (discussing constitutional limits on punitive damages imposed in cases of simple economic loss)).   Again assuming that the maximum punitive damages allowed under due process would apply, an individual claim could remain in state court by seeking only an amount of restitution, plus a punitive damages multiplier in accordance with *Campbell*, that totals $75,000 or less.   *See id.*; *accord Smith*, 236 F.3d at 1304 (applying similar reasoning).

Whether the case will develop in that fashion remains to be seen; the purpose of this section is to minimize the necessity for a second appeal on a jurisdictional question by resolving the parties' dispute over *Allen*.   This Court recognizes uncertainty about the application of the $75,000 amount in controversy clause, *see Lowery*, 483 F.3d at 1203-07, and certifies that guidance would help this case proceed should it remain in federal court.[15]

---

[15]   Other courts have recognized the difficulty in construing CAFA's mass action provisions.   The Eleventh Circuit found that "CAFA's mass action provisions present an opaque, baroque maze of interlocking cross-references that defy easy interpretation." *Lowery*, 483 F.3d at 1198.   The Ninth Circuit called the mass action language "bewildering" and once declined to rule on some of its "thorniest" provisions.   *Abrego Abrego*, 443 F.3d at 682, 686.   Commentators have agreed.   Andrew D. Weinstock & Philip G. Watson, *Where Defendants Fear to Tread?*, For The Defense, Apr. 2009, at 15, 17 ("Unfortunately, the language of the [mass action] provision is dense and ambiguous. . . . [Congress] passed a law that is puzzling, overly complex, and at times contradictory."); Spencer, 39 Loy. L.A. L. Rev. at 1073 ("CAFA's plain language by no means provides clear guidelines for attorneys or the judiciary.").

Fortunately, then, mass actions "are apparently not common.   Clermont and Eisenberg's study [of federal cases decided under CAFA between February 18, 2005 and August 18, 2007] unearthed only two cases that involved a mass action and only three others that discussed a mass action."   Stephen B. Burbank, *The Class Action Fairness Act of 2005 in Historical Context: A Preliminary View*, 156 U. Pa. L. Rev. 1439, 1449 n.29 (2008) (citing Clermont & Eisenberg, *CAFA Judicata: A Tale of Waste and Politics*, 156 U. Pa. L. Rev. 1553, 1566 n.34 (2008) (describing

There is another practical concern that could be clarified on appeal.  In a later part of CAFA – in a sub-section not presented to the *Caldwell* court – the statute states that mass actions removed to federal court "shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407."  28 U.S.C. § 1332(d)(11)(C)(i). "[S]ection 1407" refers to the federal statute authorizing and governing multidistrict litigation.  *See id.* § 1407.  CAFA thus bars a transfer to a MDL court unless a majority of plaintiffs in the mass action consent.[16]

The concern is this: in our case, who may grant or deny such consent?  The State of Mississippi is the sole plaintiff.  While Mississippi's consumers constitute hundreds of thousands if not millions of real parties in interest, they are not plaintiffs and there is no mechanism through which they can consent to transfer this case to a MDL court.  In *Caldwell*, the real parties in interest were fewer and identifiable, and there was an opportunity for them to be found and offered a chance to participate in the case pursuant to the statute.  In contrast, applying this sub-section to our real parties in interest would require a substantial number of people to be polled about their preferred forum.  This is not an outcome directed by the plain language of CAFA.  Nor is it one that comports with traditional standards of judicial economy and efficiency.  *See State of N.J. v. State of N.Y.*, 345 U.S. 369, 372-73 (1953) (describing, in a *parens patriae* action brought pursuant to the Supreme Court's original jurisdiction, "a working rule for good judicial administration" that places a "practical limitation on the number of citizens . . . who would be entitled to be made parties" alongside the state as sovereign).  If this case is returned to federal court, the parties will be asked to provide supplemental briefing on how to resolve this issue.

E.     **Federal Question Under the Sherman Act**

As recited above, "[t]he party seeking removal bears the burden of showing that federal jurisdiction is proper," *Lone Star*, 579 F.3d at 528 (citation omitted), and "any doubt as to the propriety of removal should be resolved in favor of remand," *Hot-Hed*, 477 F.3d at 323 (citations omitted).

---

federal mass actions as "rare")).

[16]  In other cases, this sub-section has been moot because the action had already been transferred to a MDL court.  *E.g.*, *Vioxx*, 2012 WL 10552.

1.    Arguments

The State contends that state antitrust remedies supplement federal remedies and are not completely preempted by them. Docket No. 20, at 11-12. It claims that the defendants' commercial activities are subject to the MAA and that any substantive defect in the complaint is for the state courts to resolve. *Id.* at 13-15. The State argues that federal question jurisdiction here is foreclosed by existing Supreme Court caselaw. Docket Nos. 20, at 11-12; 29, at 17-19.

The defendants respond that the Sherman Act, 15 U.S.C. § 7 *et seq.*, completely preempts Mississippi's antitrust laws in this instance because the alleged violations are interstate and international in nature. Docket No. 25, at 14. "Mississippi antitrust laws apply only to intrastate activity." *Id.* (citing *Standard Oil Co. of Ky. v. State*, 65 So. 468, 470-71 (Miss. 1914)). They acknowledge caselaw holding that there is no complete federal preemption in this area, but argue it is inapposite because "the Attorney General here has artfully pleaded phantom Mississippi state antitrust remedies, which do not exist for interstate conduct and transactions." *Id.* at 15.

2.    Discussion

"We start with the long-established axiom that a plaintiff is master of his complaint and may generally allege only a state law cause of action even where a federal remedy is also available." *Bernhard v. Whitney Nat'l Bank*, 523 F.3d 546, 551 (5th Cir. 2008) (citation omitted). "In determining whether a case arises under federal law, we look to whether the plaintiff's well-pleaded complaint raises issues of federal law." *Budget Prepay, Inc. v. AT&T Corp.*, 605 F.3d 273, 278 (5th Cir. 2010) (quotation marks and citation omitted).

The defendants have invoked "the 'artful pleading' doctrine, which is an 'independent corollary' to the well-pleaded complaint rule." *Bernhard*, 523 F.3d at 551 (citation omitted). "Under this principle, even though the plaintiff has artfully avoided any suggestion of a federal issue, removal is not defeated by the plaintiff's pleading skills in hiding the federal question." *Id.* (citation omitted). But the artful pleading doctrine "applies *only* where state law is subject to complete preemption." *Id.* (citation omitted).

"[A] state claim may be removed to federal court . . . when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). In *Beneficial*, "the dispositive question" was whether "the National Bank Act provide[d] the exclusive cause of action for usury claims against national banks." *Id.* at 9. A review

23

of that Act and "the special nature of federally chartered banks" supported that the answer was 'yes'; federal jurisdiction was appropriate. *Id.* at 10. This was a rare instance of complete preemption, which is an "extraordinary" finding. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987); *see Hoskins v. Bekins Van Lines*, 343 F.3d 769, 773 (5th Cir. 2003) (collecting the few cases finding complete preemption).

"The question in complete preemption analysis is whether Congress intended the federal cause of action to be the exclusive cause of action for the particular claims asserted under state law." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011) (quotation marks and citations omitted). Courts presume that state laws are not preempted until Congress clearly states otherwise. *Id.* at 803-04. "This assumption applies with 'particular force' when Congress legislates in a field traditionally occupied by state law." *Id.* at 804 (citation omitted).

The Supreme Court has concluded that "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies." *California v. ARC America Corp.*, 490 U.S. 93, 102 (1989) (citations omitted). "And on several prior occasions, the Court has recognized that the federal antitrust laws do not pre-empt state law." *Id.* (citations omitted); *Moore*, 900 F. Supp. at 33.

The defendants concede the existence of *ARC America*, even as they observe that it did not address Mississippi law. Docket No. 25, at 15. They have not pointed to any statute indicating that Congress intended federal antitrust laws to completely preempt state antitrust laws and be the exclusive remedy for claimed violations of state antitrust laws. The defendants further acknowledge that "the Fifth Circuit has not decided whether a Mississippi state antitrust claim based on interstate activity is preempted by the Sherman Act," and rely instead upon two district court decisions in New York that allegedly found state antitrust laws preempted. Docket Nos. 1, at 11; 25, at 17-18.

That is not enough. The defendants have not met their burden to show that federal antitrust laws completely preempt Mississippi's antitrust laws. There is no federal question jurisdiction. *See Adams v. General Motors Acceptance Corp.*, 307 F. Supp. 2d 812, 817 (N.D. Miss. 2004) (citing *Waste Control Specialists, LLC v. Envirocare of Tex., Inc.*, 199 F.3d 781, 784 (5th Cir.) (holding that federal court lacked jurisdiction to consider whether state law claims were viable "considering the absence of complete preemption in the antitrust context"), *withdrawn and superseded in part*, 207 F.3d 225 (5th Cir. 2000)).

*IV.*     *Conclusion*

The Attorney General of Mississippi filed this action in a Mississippi state court, to enforce Mississippi's consumer protection and antitrust laws, for the protection of the economic well-being of Mississippi's consumers and governmental entities.  *See McGraw*, 646 F.3d at 178.  The State's motion to remand [Docket No. 19] is granted.  The defendants' motion to strike [Docket No. 30] is granted.  This cause will be remanded to the Chancery Court of Hinds County, Mississippi.

**SO ORDERED,** this the third day of May, 2012.

  s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE